ACCESS REPORTS

*v.*

**DEPARTMENT OF JUSTICE,**
**Appellant.**

**No. 90–5044.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 27, 1990.

Decided March 1, 1991.

Nathan Dodell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, Washington, D.C., for appellant.

Harry A. Hammitt of the bar of the Supreme Court of Virginia, pro hac vice, Catlett, Va., by special leave of the Court, with whom Eric Glitzenstein was on the brief, Washington, D.C., for appellee.

Before MIKVA, Chief Judge, and WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Once again this court is asked to define the scope of the "deliberative process" privilege contained in Exemption 5 of the Freedom of Information Act ("FOIA"). See 5 U.S.C. § 552(b)(5) (1988). Access Reports, a biweekly newsletter that features information on FOIA, seeks a copy of a single internal memorandum written by a staff attorney at the Department of Justice. The memorandum, dated November 25, 1981, contains an analysis of amendments to FOIA proposed by the Department and introduced in the Senate in October 1981. Because the memorandum was prepared after the Department's decision to introduce the amendments, and because the Department could not "pinpoint" a later decision to which the document contributed, the district court held that the memorandum was not protected by Exemption 5. We reverse.

I

In 1981 the Department sought to persuade Congress to pass amendments to the Freedom of Information Act. At the request of the Reagan administration, Senator Orrin Hatch introduced an amending bill on October 20, 1981. See S. 1751, 97th Cong., 1st Sess. (1981), *reprinted in Freedom of Information Act: Hearings Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 97th Cong., 1st Sess. 53 (1982); see also *id.* at 807 (statement of Sen. Hatch). After launching this initiative, Department offi-

cials became concerned about how to respond to critics claiming that the amendments would make FOIA too restrictive. Specifically, they were worried about a study by the Congressional Research Service ("CRS")[1] that listed some 275-odd disclosures of information under FOIA found in news articles over a nine-year period. The critics argued that if the proposed amendments had been in effect, many of the listed articles could not have been written. Robinson Declaration ¶ 3, Joint Appendix ("J.A.") at 306. In the expectation that legislative review of the Department's proposals would likely require some reaction to the CRS study, top officials of its Office of Legal Policy asked a newly hired staff attorney, Michael E. Robinson, to analyze the study "to determine whether the information discussed in those articles would have been subject to disclosure under the Department's proposed amendments." Robinson Declaration ¶¶ 3–4, J.A. at 306.

Robinson quickly prepared a 200-page memorandum that marched through the CRS study article-by-article, seeking to answer his superiors' question. See J.A. at 7 (redacted version). In his declaration later filed in the district court, he said that he believed he was creating an "internal working document" that would not be disclosed to the public, and that had he thought otherwise he would have been more cautious in his legal analysis and more hesitant to reach conclusions. Robinson Declaration ¶ 6, J.A. at 307.

After learning of the memorandum, Access Reports filed a FOIA request with the Department for its release. The Department responded by releasing a redacted version, excluding all discussion of how the information noted in the CRS study would have fared under the proposed amendments, and leaving little more than a restatement of the facts reported by the CRS. Access Reports appealed the decision through administrative channels and, receiving no response, filed a complaint in district court. In an unpublished memo-

---

1. Congressional Research Service, Library of Congress, Press Notices on Disclosures Made

Pursuant to the Federal Freedom of Information Act, 1972–1980: A Compilation (1981).

randum and order, the district court entered summary judgment for Access Reports and ordered the Department to release an unredacted copy. This appeal followed.

## II

■ Exemption 5 excludes from FOIA's general disclosure requirements "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (1988). This language covers intra-agency memoranda that would routinely be shielded from discovery in private litigation because of the government's "executive privilege", which protects the "deliberative or policymaking processes" of government agencies. See *EPA v. Mink*, 410 U.S. 73, 89, 93 S.Ct. 827, 837, 35 L.Ed.2d 119 (1973); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 & n. 16, 95 S.Ct. 1504, 1515 & n. 16, 44 L.Ed.2d 29 (1975). According to the legislative history of Exemption 5, the purpose of the privilege is to "encourage the 'frank discussion of legal and policy issues'" within the government. *Wolfe v. HHS*, 839 F.2d 768, 773 (D.C.Cir.1988) (en banc) (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965) U.S.Code Cong. & Admin. News 1966, 2418); see also *Sears*, 421 U.S. at 150, 95 S.Ct. at 1516. An agency invoking the exemption carries the burden of establishing its applicability. See *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 861 (D.C.Cir.1980); accord *Senate of Puerto Rico v. United States Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir.1987).

The courts have said that an agency asserting the privilege must show that the document is both "predecisional" and "deliberative". See, e.g., *Wolfe*, 839 F.2d at 774; *Coastal States*, 617 F.2d at 866. Plaintiff here has framed its argument mainly as a claim that the memo is not predecisional. It characterizes the memo as a document "that was prepared expressly to support a decision that had already been made". Brief for Appellee at 13. Access Reports also argues that it cannot be

predecisional because the Department has failed to "pinpoint" any later decision. The argument by characterization misses the mark, and the Department's failure to "pinpoint" a later decision is not fatal to its claim of privilege.

As deliberation typically looks toward a future decision, an independent requirement that a document be predecisional may seem redundant. When would a deliberative document not also be predecisional? But an agency's contemporaneous or after-the-fact explanation of a decision will often be "deliberative" as the word is used in common parlance, in that it carefully weighs the arguments for and against various outcomes before announcing a winner. Because the courts have determined that Congress did not intend to exempt such explanatory documents from FOIA's disclosure requirements, they have denied the privilege in these circumstances by finding that the documents are not "predecisional".

The Supreme Court took this approach in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–52, 95 S.Ct. 1504, 1516–17, 44 L.Ed.2d 29 (1975), noting that although Congress clearly believed that disclosure of predecisional communications would inhibit them and adversely affect the quality of agency decisions, it was "difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached." *Id.* at 151, 95 S.Ct. at 1516. Relying in part on FOIA's affirmative requirement that agencies disclose "final opinions", see 5 U.S.C. § 552(a)(2) (1988), the Court reasoned that while the public is only marginally interested in arguments that were rejected or that *might* have been invoked in favor of a decision, it had a vital interest in discovering "the basis for an agency policy actually adopted. These reasons, if expressed within the agency, constitute the 'working law' of the agency...." 421 U.S. at 152–53, 95 S.Ct. at 1517; see also *Coastal States*, 617 F.2d at 867 ("[a] strong theme of our opinions has been that an agency will not be permitted to develop a body of 'secret law'"). The "predecisional" requirement helps to iden-

tify such documents and to exclude them from Exemption 5.

In fact, the word "deliberative" as used in the law of Exemption 5 is considerably narrower than the colloquial meaning; as a consequence, the "deliberative" and "predecisional" requirements tend to merge. Both terms have come to apply only to documents that contribute to an ongoing deliberative *process* within an agency. For instance, in *Coastal States* we said that a document is deliberative if it "reflects the give-and-take of the consultative process", 617 F.2d at 866, while in *Taxation with Representation Fund v. IRS* we observed that "*[p]redecisional* documents are thought generally to reflect the agency 'give-and-take' leading up to a decision that is characteristic of the deliberative process," 646 F.2d 666, 677 (D.C.Cir.1981) (emphasis in original). In *Senate of Puerto Rico,* we told the agency that it "must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process'" to fulfill the *deliberative* requirement, but we were quoting a portion of the *Coastal States* opinion discussing the *predecisional* label. *Senate of Puerto Rico,* 823 F.2d at 585–86 (quoting *Coastal States,* 617 F.2d at 868).

A key feature under both the "predecisional" and "deliberative" criteria is the relation between the author and recipients of the document. A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take. See, e.g., *Senate of Puerto Rico,* 823 F.2d at 586 (emphasizing relative positions); *Coastal States,* 617 F.2d at 868 (same); *Vaughn v. Rosen,* 523 F.2d 1136, 1146 (D.C.Cir.1975) (same); *Taxation with Representation,* 646 F.2d at 678 (stressing author's decisionmaking authority or lack of it); *Senate of Puerto Rico,* 823 F.2d at 586 (same); *Coastal States,* 617 F.2d at 866 (contrasting "personal opinions of the writer" with "the policy of the agency"); see

also *Sears,* 421 U.S. at 155, 95 S.Ct. at 1518 (noting that recipient has no "decision to make" on receipt of final opinion). The cases have mentioned these features sometimes as going to the document's "deliberative" character (see, e.g., *Senate of Puerto Rico's* reference to relative positions), sometimes as going to its predecisional character (see, e.g., *Vaughn's* similar reference), and sometimes without differentiation (see, e.g., *Coastal States's* contrast of personal opinions of writer with agency's policy).

Perhaps the predecisional-deliberative distinction does serve a useful purpose not explicitly acknowledged in earlier cases. Compare *Formaldehyde Institute v. HHS,* 889 F.2d 1118, 1121–22 (D.C.Cir.1989) (observing that the two criteria are not "coterminous"). While the "predecisional" label clearly focuses attention on the role of the entire document in the decisionmaking process, see *Sears,* 421 U.S. at 152 n. 19, 95 S.Ct. at 1517 n. 19 (emphasizing the function of the document); *Formaldehyde,* 889 F.2d at 1122, 1123 (similar), the "deliberative" criterion may be useful in distinguishing between privileged and non-privileged material within a single "predecisional" document. Thus the opinion-fact line that we have often used as a rough guide to separate exempt from non-exempt material grows out of the "deliberative" requirement. See *Wolfe,* 839 F.2d at 774. The "key question" in identifying "deliberative" material is whether disclosure of the information would "discourage candid discussion within the agency." *Dudman Communications Corp. v. Department of Air Force,* 815 F.2d 1565, 1567–68 (D.C.Cir. 1987); see *Quarles v. Department of Navy,* 893 F.2d 390 (D.C.Cir.1990). So used, "deliberative" tends more to its common meaning. The issue of whether a document (including both opinions and facts) contributes to an agency's deliberative process can then be captured exclusively in the "predecisional" requirement.

■ In our case the agency has already released the factual portions of the Robinson memo, so that only the "deliberative" passages remain in dispute—those contain-

ing his legal analysis and conclusions. The question remains whether the memo as a whole is "predecisional". Here the memo bears a superficial relation to the sort of "final opinion" or postdecisional explanation or justification that *Sears* placed outside the privilege: Robinson prepared the memo to help his superiors in the process of defending the legislative package that the Department had already offered. But Robinson's chiefs never asked him, a brand new staff attorney at the time he received the assignment, to "explain" the decision to initiate a legislative proposal. They certainly did not seek his work as a draft of some sort of agency "working law" on when to offer FOIA amendments (if we can think of so political a decision as being in any way susceptible to the notion of "law").

Because the memo explores how a set of cases might play out under the Department's proposals, it may look like a guide to decision of future cases and thus a kind of agency law. But the look is deceiving. Robinson's chiefs did not ask for the memo to guide them through future dispositions of FOIA requests that might be received if the bill were passed. They sought the memo in part as ammunition for the expected fray, in part as advice on whether and when to duck. It was, as a member of the panel suggested at oral argument, somewhat like a staffer's preparation of "talking points" for an agency chief about how to handle a potentially explosive press conference.

The district court held that the document was not "predecisional" in large part because the Department could not "pinpoint" a single decision to which the memorandum contributed. Memorandum and Order filed Dec. 4, 1989, at 4. Two of our earlier cases have indeed used that metaphor, but in context the language cannot be taken to require that the document contribute to a single, discrete decision.

In both cases, *Paisley v. CIA*, 712 F.2d 686 (D.C.Cir.1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C.Cir.1984), and *Senate of Puerto Rico, supra*, we dealt with district court applications of Ex-

emption 5 where we found the court's analysis "cursory", *Paisley*, 712 F.2d at 698, or the government's allegations supporting the privilege "conclusory", *Senate of Puerto Rico*, 823 F.2d at 585. In both we were concerned that there might be "no definable decisionmaking process" to which the documents contributed. *Paisley*, 712 F.2d at 698; see also *Vaughn*, 523 F.2d at 1146. Accordingly we directed the lower court's attention on remand in each case to the question of whether, in fact, the documents had contributed to a deliberative process within the agency. But in *Senate of Puerto Rico*, after referring to the "pinpoint" language of *Paisley*, we also noted that "the *process* leading to a decision to initiate, or to forego, prosecution is squarely within the scope of this privilege." 823 F.2d at 585 n. 38 (emphasis added).

Any requirement of a specific decision *after* the creation of the document would defeat the purpose of the exemption. At the time of writing the author could not know whether the decisionmaking process would lead to a clear decision, establishing the privilege, or fizzle, defeating it. Hedging his bets, he would be drawn into precisely the caution, or the Aesopian language, that the exemption seeks to render unnecessary. See *Schell v. HHS*, 843 F.2d 933, 941 (6th Cir.1988) (rejecting the "pinpointing" language of *Paisley* and *Senate of Puerto Rico*). Thus it is no surprise that the Supreme Court, in *Sears*, noted that the exemption aimed at protecting the decisional *process*, that many processes might not "ripen into agency decisions", 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18, and that the exemption does *not* "turn[ ] on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared." *Id.;* see also *Vaughn*, 523 F.2d at 1146 ("We are not saying that a 'final decision' is necessary for there to be a 'deliberative process' which is protected by Exemption 5.").

The Department here met its burden of identifying the decisionmaking process to which Robinson's memorandum contributed—the Department's study of how to shepherd the FOIA bill through Congress. Exemption 5 protects such communications

just as it protects ones contributing to deliberations about whether to introduce legislation in the first instance.

 Almost as an afterthought, Access Reports argues in its brief that even if Robinson's memorandum was predecisional, the document lost its Exemption 5 protection when a Department official referred to the results of Robinson's study in testimony before a Senate committee. Brief for Appellee at 14. Access Reports relies on the holding of the *Sears* court that a document protected by Exemption 5 loses that protection if the agency "chooses *expressly* to adopt or incorporate by reference [the] intra-agency memorandum." 421 U.S. at 161, 95 S.Ct. at 1521 (emphasis in original).

The Department official had spoken of an internal Department analysis which, he understood, showed that out of some 500 FOIA disclosures listed in a study called "Former Secrets" (which was produced in May 1982 by "a group categorically opposed to any amendment of the FOIA"), "only four cases" would come out differently under the proposed bill. *Freedom of Information Reform Act: Hearings on S. 774 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 98th Cong., 1st Sess. 30, 501 (1984) (testimony of Assistant Attorney General Jonathan Rose; remarks of Sen. Patrick Leahy). Research by an archivist in the Office of Legal Policy has turned up no Department of Justice analysis of the "Former Secrets" cases, Nisbet Declaration ¶ 6, J.A. at 223, so one might read the confused statement as a reference to Robinson's November 1981 memo. Even if it was, however, it fell far short of the *express* adoption required by *Sears*. The Court has refused to equate reference to a report's conclusions with adoption of its reasoning, and it is the latter that destroys the privilege. See *Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975); see also *Common Cause v. IRS*, 646 F.2d 656, 660 (D.C.Cir.1981) (casual allusion in a postdecisional document to reasons offered in predecisional memoranda is

not express adoption); *Swisher v. Department of Air Force*, 660 F.2d 369, 371 (8th Cir.1981) (no express adoption where letter to plaintiff relies on factual matters in predecisional document). But cf. *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir.1977) (express adoption found where final opinion quotes predecisional document, claims consistency with its conclusions, and states that the document is on file with the agency).

\*　　\*　　\*　　\*　　\*　　\*

Because the Department has met its burden of showing that Robinson's memorandum is "predecisional" by identifying the decisionmaking process to which it contributed, we find that the redacted portions of the memorandum were properly withheld under Exemption 5. The judgment of the district court is

*Reversed.*